THE COLUMBIA.[1]

UNITED STATES *v.* THE COLUMBIA.

*(District Court, E. D. New York.* July 26, 1889.)

SHIPPING—VIOLATION OF PASSENGER ACT.

On the evidence in this case the court found that the steam-boat Columbia, during an excursion trip from New York to Rockaway, on Sunday, July 17, 1888, carried 777 passengers in excess of the number allowed her by law; but, as the libel only charged an excess of 677, and limited the demand to $7,108, and no application was made to amend the libel, *held,* that the steam-boat was liable to a penalty of $10.50 for each of 677 passengers carried, or $7,108.

In Admiralty.
*Mark D. Wilber,* U. S. Dist. Atty., for libelant.
*Blair & Rudd,* for claimant.

BENEDICT, J. This is a proceeding on the part of the United States to enforce a lien upon the steam-boat Columbia for carrying passengers in excess of the number allowed by law, on Sunday, July 17, 1888. On that day the Columbia made an excursion trip from New York to Rockaway, starting from Twenty-Second street, New York city, stopping at Tenth street, then at pier 6 North river, in New York city, then at Jewell's wharf Brooklyn, thence proceeding to Rockaway and return. By law she was forbidden to carry a greater number of passengers than 3,000. The charge in the libel is that on the occasion in question she carried 3,677. The law applicable to the case is not in dispute. The steam-boat is conceded to be liable to pay $10.50 for each passenger in excess of 3,000 proved to have been carried by her on this occasion. The only question to be decided is the question of fact whether the proofs show that the passengers on board the steam-boat on the occasion in question numbered more than 3,000.

The evidence in support of the charge consists of the testimony of two passengers who were on board the Columbia on the trip described, and who testify to having counted the passengers as they left the boat upon her arrival at Rockaway. This count of passengers was made under the following circumstances: The two witnesses,—one named William H. Ripley, and the other, William M. Rogers,—with their families, constituting a party, were passengers on the boat. The boat, as they describe it, was terribly crowded. In fact she had a greater number of passengers than she had carried before during that season, or has carried since, so her assistant purser says. Induced by the crowded condition of the boat, these two passengers, after the boat had left Jewell's wharf, arranged between themselves to ascertain the number of passengers on board by counting the passengers when they should leave the boat on her arrival at Rockaway. In pursuance of this agreement, as the passengers passed

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

off the boat at Rockaway, Rogers stood on the deck over one gangway, and Ripley stood on the deck over the other of the two gangways by which the passengers left the boat, and each counted the passengers as they passed out on the gangway below him. Ripley swears that on this occasion 1,982 passengers passed out on the gangway below him, and Rogers swears that 1,795 passengers passed out on the gangway below him. Each testifies that he was able to count the passengers as they passed out, and that of the passengers who passed out of the boat he actually counted the number stated by him. As against this evidence the first position taken in behalf of the boat is that when these witnesses respectively swear that of the passengers that passed out under them, respectively, they counted the numbers stated, they swear to what was impossible for them to do, and for that reason their testimony should be rejected. But, while it may be conceded to be difficult to make an accurate count of all the passengers leaving the boat under such circumstances, it must also be conceded that the evidence does not prove it impossible that these witnesses should have counted the number of passengers they state. They are intelligent persons, who have no interest whatever adverse to the steam-boat, and they declare on oath that there was nothing to prevent their counting the passengers by the plan they adopted. Each declares that it was possible to count the passengers as they passed out on the occasion. This count was written down at the time, and the result was ascertained by them without any knowledge on their part in regard to the number of passengers which the steamer was allowed by law to carry. This positive testimony is not, in my opinion, affected by the testimony of the custom-house inspectors, produced by the owners, who narrate the difficulties they have experienced in counting passengers, one of whom says: "I never have found an excess of passengers on any steamer yet." But it is said that the count of Rogers is discredited by himself, because when he reported the case to the district attorney he reported 100 less passengers than he counted, having deducted 100, as he now says, to allow for mistakes. But on the stand Rogers gives positive testimony that on the occasion in question he counted 1,795 passengers who passed out on the gangway below him. It is the count, and not the report to the district attorney, which is important here. The appearance of these two witnesses upon the stand, the character of the statements they give, their intelligence and evident freedom from bias, all go to confirm the belief that what they say in regard to the number of passengers counted by them on the occasion in question is true. In the absence of controlling evidence to the contrary, such testimony is all-sufficient to prove that this boat carried upon the day in question passengers in excess of the number allowed by law.

But it is further contended on the part of the defense that the testimony of these two witnesses is overthrown by the proof furnished from the boat of the number of passenger tickets taken in on the trip in question. The proofs show that the boat took passengers at Twenty-Second street, at Tenth street, at pier 6, in New York, and at Jewell's wharf, in

Brooklyn. There had been, as appears, a custom-house officer detailed to special duty in the First division of the collector's office, whose duty it was to prevent overloading of the boat. His instructions, as he narrates them, do not appear to me to be very efficient to secure an enforcement of the law; for he says: "A portion of my duty was, if I had reason to believe that boats were to be crowded, I was to make a requisition on my deputy collector, who sent that requisition to the surveyor, and he detailed officers to count the passengers on the boats that I might name." But this is not important, for the officer was not present at all on the Sunday in question, because, as he says: "I was taken very sick that morning, and didn't leave the house." The boat, therefore, on this occasion took passengers without government supervision. Most passengers surrendered tickets on going on board. A few—how many does not appear—had no tickets, and paid money to the purser. Some passes were out, and how many came in on passes does not appear. The tickets were taken in at the gangway as the passengers came on board the boat, by the purser and the assistant purser. It was usual to bunch the tickets taken at any landing into packages of 100 during the passage of the boat to the next landing, but on the trip in question, when the boat arrived at pier 6, only part of the tickets taken at the prior landings had been bunched. While the boat was at pier 6, Perkins, the general agent of the line, and Hoffmire, the president of the company owning the boat, boarded her. As they came onto the boat, Perkins thought he saw an unknown man counting the passengers. He instantly called Hoffmire's attention, and also the superintendent's attention, to the man, and as soon as the boat left pier 6 proceeded to the purser's office for the purpose, as he says, of ascertaining how many passengers could be taken at Jewell's wharf without exceeding the number allowed by law. About 15 minutes were occupied in going from pier 6 to Jewell's wharf. During that time the purser's office was visited by Perkins, by Hoffmire, by the assistant purser, and the master of the boat, and by two persons afterwards selected to count the passengers that should come on board at Jewell's wharf. Perkins says that in the purser's office he counted 23 bunches of tickets. One bunch contained only 14 tickets. How many tickets were in the other bunches he did not ascertain, but upon the assumption that each bunch contained 100 tickets he says: "I told Hoffmire we could easily take in 700 passengers more, as there was, as near as I could make out, but 2,214 passengers on board the boat." Upon this report Hoffmire directed that the passengers coming on board at Jewell's wharf should be counted, and that no more than 700 should be taken on board the boat. When the boat arrived at Jewell's wharf, the two persons already referred to were directed to count the passengers as they came on board, and to give a signal when 700 had been counted. Thereafter, when 675, according to one of the counters, and when 650, according to the other, of in-going passengers had been counted, the signal was given, and the reception of the passengers was stopped. The boat then departed for Rockaway, leaving some 300 passengers behind on Jewell's wharf, who were unable to get on board. The proof satis-

factorily shows the number of passengers taken on board at Jewell's wharf, and the case turns upon the testimony as to what was done in the purser's office after it was reported that an unknown man had been seen counting the passengers. This proof is far from convincing to show that only 2,214 passenger tickets had been taken up at the time the vessel left pier 6. When the vessel left pier 6 some tickets had been bunched; others had not. Of the six persons who were in the purser's office, some took part in counting the tickets; others "run the bunches over." That Perkins there found 23 bunches of tickets is no doubt true, but his testimony is by no means sufficient to justify the conclusion that only 2,214 tickets had been taken at the gangways; for Perkins did not count the number of tickets in the bunches he found, and he has no knowledge that the bunches that he counted contained all the tickets that had been taken. There is in addition some testimony from the master of the boat to the effect that before the boat arrived at pier 6 the purser had told him the number of the tickets taken, but his statements, when carefully examined, show that his testimony does not help the case of the claimants. After a careful scrutiny of all the evidence produced in behalf of the boat, I am unable to find in it proof that the number of tickets taken in on that day before the boat reached Jewell's wharf was 2,214. This is a vital point of the defense. Without that point made certain, the other evidence from the steamer amounts to little or nothing. Moreover, it appears that the number of tickets taken did not accurately represent the number of passengers on board, for some paid money and some came in on passes. Furthermore, it is to be noticed that Perkins' statement that there were no more than 2,214 passengers on board at the time was repudiated by Hoffmire. Upon the assumption that no more than 2,214 were on board when she left pier 6, the boat could take 786 passengers at Jewell's wharf without exceeding her limit. The proof is that Hoffmire directed that no more than 700 should be taken. Inasmuch as it is impossible to believe that Hoffmire determined to refuse to take 86 passengers which he believed could be lawfully taken, and with safety, when there were some 300 passengers upon the dock waiting to go on board, the fact that he directed that no more than 700 should be taken seems to me to indicate that he was not convinced by Perkins' statement that the number of passengers on board the boat did not exceed 2,214. If Hoffmire, the president of the company, being there present, and seeing the crowd, thus discredited Perkins' count of tickets, it is difficult to see how the court can be asked to hold that count of tickets sufficient to overthrow the actual count of persons made by Ripley and Rogers. Perkins' count is also discredited by the purser's return on the trip in question. The claimants produce a written return made by the purser after the boat had left Jewell's wharf, which purports to show the number of tickets taken at each landing on this trip, and this return gives as the number of tickets taken prior to pier 6 a different number from that reported by Perkins to Hoffmire. This return of the purser, while it discredits the count made by Perkins, cannot be held sufficient to overthrow the testimony of Ripley and Rogers. It is impossible to conclude

from the purser's testimony that there is any certainty that the tickets counted by him when making his return were all the tickets that had been taken in on that day. And one cannot overlook the fact that this return was made, as the report of Perkins was, after it was known that a question had been raised as to the number of passengers on the boat, and when it was believed that the passengers on board had been counted by some unknown person. Under such circumstances the officers of the boat must surely be strongly biased in favor of the boat, and their testimony of less weight for that reason. I am therefore constrained to take the testimony of Ripley and Rogers to be true, and to hold it to be sufficient proof that the number of passengers on board the boat exceeded the number allowed by law by 777. It may properly be added that, if the owners of boats, in view of the provisions of the law respecting an excess of passengers, would provide a regular and accurate method by which to ascertain and to record on every trip the exact number of passengers taken, they would be better able to answer charges like the present than are the owners of this boat. By law the boat is to be charged $10.50 for each passenger in excess of 3,000 carried on this occasion. The conclusion I have reached as to the number would warrant a decree for $8,158.50, but, inasmuch as the libel only charges an excess of 677, and limits the demand to $7,108, and no application has been made to amend the libel, I limit the decree to the sum demanded. Let a decree be entered for the sum of $7,108 and costs.